IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL RICHARD McGANN, )
                Plaintiff, )
)
vs. ) Civil Action No. 15-423
) Chief Magistrate Judge Maureen P. Kelly
CINEMARK USA, INC., )
                Defendant. )

# OPINION

**KELLY, Chief Magistrate Judge**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts relative to this case are largely undisputed and have been set forth in full in the Amended Joint Stipulation of Fact submitted by the parties. See ECF No. 39. The Court therefore will recite only those facts that are necessary to place the limited issue before the Court in context, namely, whether Defendant Cinemark USA, Inc. ("Cinemark") has violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, by refusing to provide Plaintiff Paul Richard McGann ("Mr. McGann") with a tactile interpreter during movie presentations.

Mr. McGann has Usher's Syndrome Type I, as a result of which he was born deaf and progressively lost his sight starting at age five until he became completely blind approximately fifteen years ago. Mr. McGann primarily uses American Sign Language ("ASL") to communicate; he can expressively communicate using ASL and receptively communicate using ASL tactile interpreters. Tactile interpretation can be accomplished in a number of ways, including the hand-over-hand method that Mr. McGann most commonly uses in which he places his hands lightly upon the back of the hands of the interpreter to read the ASL signs through

touch and movement.  Different tactile interpretation methods include, without limitation, sign language interpretation at close visual range, sign language interpretation at close visual range combined with tracking (that is, hands placed on wrists or forearms), hand-on-hand tactile interpretation, finger spelling, print-on-palm techniques, and protouch/protactile communication (that is, combining deaf-blind communication with touching to provides environmental information, such as touching an area of a deaf-blind individual's back to indicate when audience members laugh and where they are located).

Mr. McGann enjoys attending movies at theaters and does so for a variety of reasons such as joining in discussions about the movies with friends and family.  In November 2014, Mr. McGann heard about the movie *Gone Girl* and, having read the plot on Wikipedia using Braille, became interested in attending the movie.  Cinemark, which owns, operates, and/or leases ten movie theaters in the Commonwealth of Pennsylvania, was showing the movie *Gone Girl* at its Robinson Township theater ("Cinemark Robinson").  On December 4, 2014, Mr. McGann sent an email to Cinemark Robinson requesting that Cinemark provide interpreters familiar with tactile interpretation for a showing of *Gone Girl*.  Joint Exh. 2.  On December 10, 2014, Mr. McGann contacted Cinemark and was advised to contact Ms. Lesley Pettengill, who works at the Plano, Texas office of Cinemark, about his request for a tactile interpreter.  Mr. McGann emailed Cinemark Robinson and Ms. Pettengill (using an incorrect email address) on that same date to request tactile communication services for a showing of *Gone Girl*.  Ms. Pettengill's email address was later corrected and Mr. McGann's December 10, 2014 email was forwarded to Ms. Pettengill later that same day.  Joint Exh. 3.  On December 12, 2014, Ms. Pettengill responded to Mr. McGann by email indicating that she was looking into Mr. McGann's inquiry and would get back to him when she had more information.  Joint Exh. 4.  Mr. McGann replied to Ms.

Pettengill's December 12, 2014 email later that day noting the long wait and conveying how much he wanted to see *Gone Girl*. Joint Exh. 5. On December 15, 2014, Ms. Pettengill wrote responded to Mr. McGann denying his request for tactile interpreter services. Joint Exh. 7.

Mr. McGann filed the instant Complaint on March 27, 2015, bringing a single claim against Cinemark under the ADA. ECF No. 1. Specifically, Mr. McGann alleges that Cinemark has violated Title III of the ADA, 42 U.S.C. §§ 12181-12189, by denying him full and equal enjoyment of Cinemark's services and facilities because of his disability and by failing to make reasonable modifications in its policies, practices and procedures in order to afford Mr. McGann access to its services.

Following a period of discovery, the case was scheduled for a non-jury trial before the undersigned on January 21, 2016. ECF Nos. 30, 31. As ordered by the Court, trial briefs were filed by the parties on January 8, 2016, and the parties' respective responses were filed on January 14, 2016. ECF Nos. 32, 34, 38, 40. The parties also filed an Amended Joint Stipulation of Fact on that same date. ECF No. 39.

At the final pretrial conference, which was held by telephone on January 15, 2016, the parties agreed to present their respective cases through the oral argument of counsel, resting on their trial briefs, the Amended Joint Stipulation of Fact and the Joint Exhibits which were also submitted to the Court. ECF No. 41. The bench trial was held on January 21, 2016, as scheduled, at which time counsel for the parties presented their respective arguments to the Court. ECF No. 44. This Opinion resolves the narrow legal issue presented in this case, *i.e.*, whether Title III of the ADA requires Cinemark to provide individual tactile interpretation for the movies it exhibits when requested by a deafblind patron. For the reasons that follow, the Court finds that it does not.

## II. DISCUSSION

The ADA was enacted "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(2). Title III of the ADA, which prohibits discrimination by public accommodations, provides that:

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). See Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc., 603 F.3d 666, 669-70 (9th Cir. 2010). Thus, to prevail on a discrimination claim under Title III, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his or her disability. Id.

The parties in this case do not dispute that Mr. McGann is disabled as defined under the ADA, nor do they dispute that Cinemark is a private entity that owns a place of public accommodation. The only issue before the Court therefore is whether Cinemark discriminated against Mr. McGann by depriving him of the full and equal enjoyment of the services or accommodations that Cinemark provides and did so because of Mr. McGann's disability.

Title III provides that discrimination by public accommodations includes:

> (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from *fully and equally* enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of goods, services, facilities, privileges, advantages, or accommodations being offered;
>
> (ii) a failure to make *reasonable modifications* in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to

individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services*, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A) (emphasis added). Auxiliary aids and services, in turn, are defined under the ADA as including:

> (A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
>
> (B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
>
> (C) acquisition or modification of equipment or devices; and
>
> (D) other similar services and actions.

42 U.S.C. § 12103(1). The Federal Regulations governing the ADA also provides examples of auxiliary aids including:

> (1) Qualified interpreters, notetakers, computer–aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
>
> (2) Qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments;
>
> (3) Acquisition or modification of equipment or devices; and
>
> (4) Other similar services and actions.

5

28 C.F.R. § 36.303(b). Title III requires that these auxiliary aids and services be furnished by a public accommodation "where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303 (c)(1). A public accommodation, however, is not required to furnish goods or services that it does not ordinarily provide or alter the goods and/or services it does provide in order to avoid violating Title III. McNeil v. Time Ins. Co., 205 F.3d 179, 188 (5th Cir. 2000).

Mr. McGann alleges that Cinemark has discriminated against him by refusing to provide him with an auxiliary aid in the form of a tactile interpreter thereby failing to take the steps necessary to ensure that he is not excluded from fully and equally enjoying the services that Cinemark provides.[1] Mr. McGann argues that because auxiliary aides are defined as including qualified interpreters and "other effective methods" of making aurally and visually delivered materials available to individuals with hearing an visual impairments, and because tactile interpretation is the only method by which Mr. McGann is able to fully enjoy the movie experience enjoyed by non-disabled patrons, Cinemark is obligated under Title III to provide him with a tactile interpreter.

Cinemark, on the other hand, emphasizes that Title III only ensures that disabled persons are not denied access to places of public accommodation and the goods and/or services that they offer and does not regulate the contents of the goods or services provided, require a place of a public accommodation to provide goods or services not ordinarily provided or goods and services specially designed for disabled persons. Cinemark argues that the service it offers is simply to allow the public to enter its facilities to view movies that are created and provided by

---

[1] Tactile interpretation for a movie that is more than ninety minutes long, such as *Gone Girl*, requires a team of two tactile interpreters. The two tactile interpreters take breaks and switch places every twenty minutes. ECF No. 39 ¶¶ 47-49. The tactile interpreters communicate less than all visual and audio elements in a verbatim manner. They also communicate the movie environment, such as whether patrons are laughing or crying. Id. ¶¶ 56, 58.

6

movie studios and that it does not provided individual tactile interpretation for movie screenings in the normal course of its business. Cinemark therefore concludes that providing individual tactile interpreters would constitute an additional and/or different service than Cinemark normally provides which goes beyond that required under Title III. In this manner, Cinemark argues, Mr. McGann is not seeking an auxiliary aid because, by definition, an auxiliary aid is and aid that is supplementary to that already provided. The Court agrees.

Although there is a dearth of case law directly on point, the cases that have been cited by the parties have permitted the Court to engage in a thorough and thoughtful analysis in resolving the issue before it. The Court, however, finds that the cases relied upon by Cinemark, which focus on an "access versus content" rationale, particularly persuasive.

In McNeil v. Time Ins. Co., 205 F.3d 179, for instance, the plaintiff brought an action against the insurance company that had issued a health insurance policy to him. The policy, which became effective on May 1, 1994, provided for a lifetime maximum benefit of $2 million but included a limitation on coverage for, *inter alia*, AIDS and AIDS Related Complex to $10,000 during the first two years of the policy; maximum benefits, however, would be provided thereafter. The plaintiff was diagnosed with AIDS in September of 1994, and died on March 1, 1995, only ten months after the insurance policy was issued and well before the two year limitation on coverage for AIDS expired. Plaintiff, and ultimately the executor of his estate, claimed that the defendant's policy violated Title III of the ADA because the AIDS limitation provision denied him full and equal enjoyment of the goods and services provided by the defendant. The United States Court of Appeals for the Fifth Circuit rejected the plaintiff's argument finding that the defendant offered the policy to the plaintiff on the same terms as it offered the policy to others and thus plaintiff had non-discriminatory access to the good being

7

provided. The court concluded that the plaintiff's challenge to the provision of the policy was, in essence, a challenge to the content of the goods that the defendant offered which Title III does not regulate. In coming to its conclusion, the court offered the following analysis of Title III:

> [Title III] prohibits [places of public accommodation] from discriminating against the disabled. The discrimination prohibited is that the owner, etc., may not deny the disabled *the full and equal enjoyment* of the business's goods and services. Practically speaking, how can an owner, etc., deny the full and equal enjoyment of the goods or services that he offers? *By denying access to, or otherwise interfering with, the use of the goods or services that the business offers.* The goods and services that the business offers exist *a priori* and independently from any discrimination. Stated differently, the goods and services referred to in the statute are simply those that the business normally offers.
>
> We acknowledge that it is literally possible, though strained, to construe "full and equal enjoyment" to suggest that the disabled must be able to enjoy every good and service offered to the same and identical extent as those who are not disabled. Construed in this manner, the statute would regulate the content and type of goods and services. That would be necessary to ensure that the disabled's enjoyment of goods and services offered by the place of public accommodation would be no less than, or different from, that of the non-disabled. But such a reading is plainly unrealistic, and surely unintended, because it makes an unattainable demand. The unvarnished and sober truth is that in many, if not most, cases, the disabled simply will not have the capacity or ability to enjoy the goods and services of an establishment "fully" and "equally" compared to the non-disabled.
>
> \* \* \*
>
> In sum, we read Title III to prohibit an owner, etc., of a place of public accommodation from denying the disabled access to the good or service and from interfering with the disableds' full and equal enjoyment of the goods and services offered. But the owner, etc., need not modify or alter the goods and services that it offers in order to avoid violating Title III.

Id. at 186-88.

Doe v. Mut. of Omaha Ins. Co., 179 F.3d 557, 559 (7th Cir. 1999), upon which Cinemark also relies, involved a similar fact pattern to that in McNeil. In resolving the question of whether the AIDS provision in the insurance policy denied the plaintiffs equal access to the defendant's

8

goods, the United States Court of Appeals for the Seventh Circuit opined that "the core meaning of [Title III], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility . . . that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do," and that "[t]he common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated." Id. at 559, 560. To illustrate the point, the court cited a number of examples where a public accommodation's refusal to configure a service to make it as valuable to a disabled as to a nondisabled customer would not run afoul of Title III: a book store would not be required to alter its inventory in order to stock goods such as Braille books that are especially designed for disabled people; a camera store would not be required to stock cameras specially designed for disabled persons; a furniture store would not be required to stock wheelchairs; a psychiatrist would not be required to treat schizophrenia, as distinct from his refusing to treat schizophrenics for the psychiatric disorders in which he specializes; and *a movie theater would not be required to provide a running translation into sign language of the movie's soundtrack*. Id. (emphasis added). Because Title III does not require these sellers to alter their products and/or services to make them equally valuable to the disabled and to the nondisabled, the court concluded that it would not require the seller of insurance to do so either. Id. at 563.

Cinemark also relies on Cornilles v. Regal Cinemas, Inc., No. Civ. 00-173-AS, 2002 WL 31440885 (D. Or. Jan. 3, 2002), in which the plaintiffs -- eight deaf individuals -- sued the owners and operators of various movie theatres (including Cinemark) claiming that the defendants violated Title III by failing to install and utilize Rear-Window Captioning System ("RWC") or some other auxiliary aide that would allow them to equal access to the defendants'

9

services.[2] After an extensive review of the ADA, the implementing regulations and the relevant appendices to the regulations, the court found that the defendants were in compliance with the requirements of Title III and had no obligation to show open-captioned films. In so finding, the court stated:

> Plaintiffs make no claim that they have not been afforded access to any theater or the opportunity to view any movie being shown at the theaters. Similarly, Plaintiffs have no complaints about their ability to communicate with the ticket vendors or the food vendors. The only thing Plaintiffs complain about is that the vast majority of the films shown by Defendants are not captioned in any way and Plaintiffs are not able to enjoy them to the same degree as hearing individuals without access to a written transcript through captioning. Accordingly, the core issue before the court is whether Title III requires Defendants to provide captioning on all of the movies that it offers so that Plaintiffs can enjoy the movies at the same level as hearing individuals.
>
> These Regulations make it clear that Title III requires all places of public accommodation to have access to the physical environment of the accommodation. In other words, Defendants may not refuse Plaintiffs access to any portion of their theaters or refuse Plaintiffs the right to watch any film that Defendants are showing in their theaters. However, Title III does not require Defendants to provide additional access to Plaintiffs to accommodate their disability, such as providing Plaintiffs with a separate theater that is equipped solely for the use of individuals with hearing loss. Plaintiffs are merely entitled to use Defendants' theaters to the same extent as hearing individuals. They may buy a ticket for a film shown by Defendants and sit in the same theater to watch the same movie shown to hearing individuals.

Id. at *2-3. Although the court recognized that while "Title III and the regulations provide an additional obligation on a public accommodation if modifications or auxiliary aids are available

---

[2] See Ball v. AMC Entertainment, Inc., 246 F. Supp. 2d 17, 20 n.9 (D.D.C. 2003) ("[c]aptions are textual descriptions of a film's soundtrack, comprised of the dialogue and descriptions of other sounds. There are two types of captioning, open and closed. Open captions are similar to subtitles-the text is "burned" onto the film's print and is visible to everyone in the theater. Open captioning requires special prints of the film that are generally presented at special screenings . . . . Closed captioning displays the text only to patrons requiring captions, not to everyone in the theater. RWC is a specific type of closed caption technology. With RWC-compatible movies, captions are recorded on a computer disc, separate from the movie itself but provided free of charge by the movie studios, that is played simultaneously with regular screenings of the movie. As the movie is displayed on the movie screen, the captions are sent to an LED data panel installed on the back wall of the theater. Patrons then use portable, transparent acrylic panels attached to their seats to reflect the LED captions, allowing the captions to appear superimposed on or beneath the movie screen. The reflective panels are portable and adjustable (usually placed in cup holders attached to seats), enabling patrons using RWC to sit almost anywhere in the theater").

that will enhance a disabled individuals use of a public accommodation to bring it to an equal footing with that of a non-disabled individual," it also recognized the provision of such aids is limited by the Federal Regulations which provide that:

(a) This part does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities.

(b) A public accommodation shall order accessible or special goods at the request of an individual with disabilities, if, in the normal course of its operation, it makes special orders on request for unstocked goods, and if the accessible or special goods can be obtained from a supplier with whom the public accommodation customarily does business.

Id. at *3, *citing* 28 C.F.R. § 36.307.

Relying on these cases, Cinemark likens the service it provides, *i.e.*, screening movies, to that offered by an art gallery in displaying paintings created and provided by various artists and/or a concert hall that presents symphonies composed by musicians. Art galleries and concert halls are required under the ADA to ensure that the paintings and performances on display are accessible to disabled persons because that is the service they provide. Art galleries, however, do not provide verbal descriptions of the paintings they display and concert halls do not provide visual interpretations of the music being played in the normal course of business. And, as Mr. McGann concedes, under normal circumstances art galleries and concert halls are not required to provide such interpreters under Title III because any such service would be a service different from, or in addition to, that which the art gallery and/or concert hall normally provides.

Here, Cinemark displays movies that are created and provided by movie studios like an art gallery displays paintings created and provided by artists. Cinemark therefore is required to ensure that the disabled have access to those movies and, indeed, Cinemark has provided Mr. McGann with access to the movies it screens and thus is not interfering with Mr. McGann's

11

access to or enjoyment of the services that Cinemark provides. But Cinemark does not, in the normal course of its business, provide verbal descriptions or visual interpretations of the movie studios' productions or interpretations of audience reactions during movie screenings. Because it does not interpret movies for any of its patrons, providing verbal descriptions or aural interpretations would be an additional or different service than it normally provides. Under McNeil, Doe, and Cornilles, such services are not required under the ADA and Cinemark, therefore, is not in violation of Title III.

Mr. McGann nevertheless argues that Cinemark is obligated under Title III to provide him with a tactile interpreter so that he can enjoy the entire movie going experience in a manner similar to that enjoyed by non-disabled patrons. To support his position, Mr. McGann points to the fact that auxiliary aides are defined under Title III as including qualified interpreters and "other effective methods" of making aurally and visually delivered materials available to individuals with hearing and visual impairments, and that tactile interpretation is the only method by which he can enjoy the full movie experience as non-disabled patrons do.

To be sure, Title III, or, more accurately, the Federal Regulations governing the ADA, provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure *effective communication* with individuals with disabilities." 28 C.F.R. § 36.303 (c)(1) (emphasis added). It is also true that "qualified interpreters" are specifically listed in the ADA and the Federal Regulations as an example of an auxiliary aid. 42 U.S.C. § 12103 (1)(A); 28 C.F.R. § 36.303 (b). But, by definition, an aid that is *auxiliary* is necessarily one that is supplemental to that which is already provided and not an aid that provides something altogether new or different. See www.Merriam-Webster.com/dictionary/auxilairy. To use the examples cited by Cinemark, while restaurants may be required to read their menus to blind

customers so that they have access to the goods provided, restaurants are not required to provide individuals to describe the food ordered by a customer who is unable to taste it. And while an art gallery or concert hall may have office telephones on their premises, they are not required to make a telecommunication device or TTY available to its patrons because use of the telephone is not a service they provide. See 28 C.F.R. § 36.303 (d). Only public accommodations that provide their patrons with regular use of telephones as part of their normally offered services -- such as a hotel perhaps -- would arguably be required to provide TTY because TTY would be an aid auxiliary to that already provided. Similarly, an art gallery that provides docent-led tours to describe and/or critique the paintings it displays may also be required to have auxiliary aides available to disabled patrons so that they may access that service which is normally provided just as non-disabled patrons do.[3]

In this case, the service that Cinemark provides, *i.e.,* screening movies, does not include tactile interpretation and tactile interpreters are not needed to for Mr. McGann to attend a movie as non-disabled patrons do. Tactile interpreters therefore are not auxiliary to Cinemark's services and Mr. McGann is not being treated differently than non-disabled patrons because of the absence of a tactile interpreter.

The cases upon which Mr. McGann relies upon do not compel a different result. In Kalani v. Starbucks Corp., 117 F. Supp. 3d 1078 (N.D. Cal. 2015), for instance, patrons of a Starbucks coffee shop that were wheelchair-bound brought suit complaining that all of the wheelchair accessible seating required them to sit facing the wall with their backs to the inside of the store, thereby depriving them of the opportunity to participate in or benefit from Defendant's goods and services in the same manner as non-disabled patrons. The court agreed finding that

---

[3] Indeed, Cinemark concedes that it may be required to offer auxiliary aides to Mr. McCann to facilitate access to information regarding ticket pricing, movie listings and what concession items are offered because they are goods and services that Cinemark normally provides to all of its patrons.

the overall experience that Starbucks normally, and consciously, provides to its patrons includes enjoying the Store's décor and an opportunity "to be part of a community," and that being a part of or interacting with the community necessarily requires the opportunity to see and communicated with other customers.[4] Id. at 1087. Because the location of the seating for wheelchairs interfered with wheelchair-bound customers' opportunity to benefit from the social aspect of the services provided by Starbucks, which were enjoyed by its non-disabled customers, the court concluded that Starbucks was in violation of Title III.

Here, Cinemark does not encourage interaction with the community and Mr. McGann does not suggest that it does.[5] Nor is Mr. McGann seeking a different seating arrangement or any other service that is normally offered to non-disabled movie-goers. Rather, Mr. McGann seeks a service that is not provided to anyone who attends Cinemark's theatres. Providing individual tactile interpreters therefore is a service different than, or in addition to, what Cinemark normally provides and Kalani therefore does not provide the basis for finding that Cinemark has run afoul of Title III.

In Ball v. AMC Entm't, Inc., 246 F. Supp. 2d 17 (D.D.C. 2003), upon which Mr. McGann also relies, the plaintiffs, who were deaf and hard of hearing, brought a class action against movie theater operators alleging that they violated the ADA by failing to provide them with reasonable accommodations necessary for full and equal enjoyment of the defendants' services through implementation of captioning, particularly RWC. The court found that, although open-captioning was expressly excluded as a potential auxiliary aide in the Federal

---

[4] The court specifically found that Starbucks "brands itself as a place for people to come together" and encourages its patrons to use the Store as a "neighborhood gathering place." As well, the parties had stipulated that non-disabled patrons are able to sit such that they "look out at the ongoings of the Store, the Store's décor, and . . . other patrons and employees within the Store," and that Defendant "encourages a sense of community for patrons." Id. at 1087.

[5] To the extent Mr. McGann argues that the whole movie experience includes reactions to the movie content from other patrons, viewer reactions are not something Cinemark provides but is merely a by-product of the movie itself.

Regulations and the relevant House Committee Report, closed captioning was not, and that RWC clearly fit within the definition of auxiliary aids that can be required under the ADA. Id. at 22-23. See 56 Fed. Reg. 35544 at 35567; H.R. Rep. No. 101-485 (II), at 108 (1990). In addition, noting that RWC films are provided free of charge by the movie studios and can be accessed by the plaintiffs during normal screenings offered to the general public, the court concluded that installing RWC would not change the nature of the service the defendants provide, *i.e.*, screening movies. Id. at 25.

Providing an individual tactile interpreter, however, is not the same as providing closed, or even open, captioning which is largely provided by the movie studios and merely enhances the movies that are being provided by the movie studios. Further, given the technological advances that have allowed for standardized captioning and descriptive narration products created by the movie studios, the Department of Justice ("DOJ") has specifically recognized that aids such as assisted listening devices, personal captioning devices and descriptive narrative devices are now required under the ADA. See Standards 4.33.7 (1991 ADA Standards) and 706 (2010 ADA Standards; 73 Fed. Reg. 34508 at 34529-31 (proposed Jun, 17, 2008). A tactile interpreter, however, is an altogether different service and not expressly provided for in the ADA, the Federal Regulations or under the DOJ's standards.

Mr. McGann also relies upon Feldman v. Pro Football, Inc., 419 F. App'x 381 (4th Cir. 2011), in which deaf and hard-of-hearing football fans brought an action against a professional football team and the operator of the stadium where the team played. The plaintiffs alleged that the defendants violated Title III by not providing them with equal access to information broadcast over the public address system during football games including: play information; referee calls; emergency and public address announcements; and words to music and other

broadcasted entertainment. Agreeing with the district court that the defendants provide more than just a football game but also an entertainment experience, the court found that in order for the plaintiffs to enjoy a football game on a level as equal as possible to hearing spectators, they must have access to game-related information broadcast over the public address system including advertisements, public service announcements and the entertainment part of the experience. More specifically, the court found that:

> [a]dvertisements and public announcements are ... part of the services and privileges that defendants provide because they communicate to spectators a message about the Redskins stature and recognition amongst businesses and other organizations. Advertisements communicate which entities support the Redskins. Public service announcements indicate which causes the Redskins support and how spectators might become involved in those causes.
>
> * * *
>
> This experience includes aural and visual components that, although not part of the game action, play an important role in generating support for the game and promoting spectator attendance. Full and equal enjoyment of defendants' goods, services, privileges, and facilities includes aural access to the lyrics to music broadcast over the stadium bowl's public address system. Without this access plaintiffs are "otherwise treated differently" because of the "absence of auxiliary aids." 42 U.S.C. § 12182(b)(2)(A)(iii). Music played during a football game arouses enthusiasm and fosters a sense of shared participation.... By having access to the lyrics, plaintiffs have the opportunity to participate in the communal entertainment experience. Without access to lyrics played ... plaintiffs would not fully and equally experience the planned and synchronized promotional entertainment that large stadiums like FedEx Field provide.

Id. at 391-92.

The relief requested by the plaintiffs in Feldman, like that in Ball, however, involved captioning and not individual interpreters. As previously discussed, captioning is not only facilitated by recent technological advances but it merely enhances that which is normally offered. Individual tactile interpreters, however, are a separate service that is distinct from the

16

movie itself. In addition, the goods and services provided by the defendants in Feldman are distinguishable from that provided by Cinemark. The aural components to the services at issue in Feldman -- broadcasts over the public address system -- were created and provided by the defendants themselves during the football games that they exhibit. The broadcasts are also promoted by the defendants as part of the goods and/or services provided during the games. In contrast, Cinemark itself does not make broadcasts over a public address system nor does Cinemark itself create or provide any aural (or visual) services during a movie screening. Rather, the aural and visual components to which Mr. McGann seeks access is the movie itself which is created and distributed by movie studios.

The Court also finds persuasive Cinemark's argument that "effective communication" as contemplated by Title III is not at issue here. As previously discussed, Title III requires the use of auxiliary aids where necessary to ensure effective communication with individuals with disabilities. 28 C.F.R. § 36.303 (c)(1). But the communication envisaged by Title III appears to be communication between the disabled customer/patron and the service provider in order to ensure that the disabled patron has the opportunity to access the goods and services provided. Such is the situation where a restaurant may be required to read the menu to a blind customer or even provide a menu in Braille in order to effectively communicate what goods it is offering. Here, however, Cinemark is not communicating with Mr. McGann by providing him access to view the movies it displays; nor does Mr. McGann seek to communicate with Cinemark through tactile interpreters. Rather, Mr. McGann seeks a tactile interpreter to communicate to him, or retell and describe to him, the movies that Cinemark exhibits.

It also appears clear that the communication that tactile interpreters would provide to Mr. McGann during a movie screening would not be "effective" in the sense that tactile interpreters

17

do not, and cannot, provide literal translations of movies. Instead, as Mr. McGann concedes, tactile interpreters have to make judgment calls about what to communicate and what to skip and the descriptions they provide are necessarily subjective. See Amended Joint Stipulation of Facts: ECF No. 39 ¶¶ 42-46, 56, 69, 70, 72.[6] Under these circumstances, even if tactile interpreters were properly considered an auxiliary aid, they would not and cannot provide effective communication as contemplated by Title III and would not place Mr. McGann on an equal footing with non-disabled patrons. As such, while the Court is sympathetic to Mr. McGann's situation, it nevertheless must find that providing Mr. McGann with an individual tactile interpreter is not required under Title III of the ADA.

## III. CONCLUSION

For the foregoing reasons, the Court finds that Cinemark is not required to provide Mr. McGann with tactile interpreters during movie screenings because and tactile interpreters are not auxiliary aides under Title III but, rather, are an altogether different service that Cinemark does not provide in its normal course of business.[7]

---

[6] In this manner, the communication provided by a tactile interpreter and received by a deafblind individual is necessarily different from that provided to and received by non-disabled patrons. Such communication would appear to constitute a special good or service specifically designed for deafblind patrons that Cinemark does not normally provide which is not required under Title III. See 28 C.F.R. § 36.307 (a).

[7] Having so found, the Court need not reach Cinemark's defensive arguments that providing tactile interpreters for movie screenings would fundamentally alter the service it provides and/or that it would constitute an unreasonable and undue burden. See 42 U.S.C. §§ 12182 (b)(2)(A)(ii)-(iii). The Court notes, however, that under the circumstances of this case, the fundamental alteration defense is coextensive with the "access versus content" analysis utilized by the Court above and thus provides another basis for denying Mr. McGann's claim. See 56 Fed. Reg. 35544 at 35565.

Accordingly, judgment will be entered in favor of Cinemark and against Mr. McGann.

An appropriate order will be entered separately.

BY THE COURT:

/s/ Maureen P. Kelly  
MAUREEN P. KELLY  
CHIEF UNITED STATES MAGISTRATE JUDGE

Dated: April 4, 2016

cc: All Counsel of Record Via CM-ECF